IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 06-75 |
| ) | |
| GARY LAMAR DENSON, ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

Defendant Gary Lamar Denson ("Denson" or "defendant") was indicted on February 22, 2006, on one count of possession of firearm by a convicted felon, on or about July 1, 2005, in violation of 18 U.S.C. § 922(g)(1). Defendant filed a pretrial motion with this court on May 18, 2006. In the pretrial motion, defendant raised five (5) suppression issues related to defendant's arrest. The government filed a response to this motion on June 1, 2006. A suppression hearing was held on August 7, 2006.

At the hearing on defendant's motion for suppression, the court addressed the following arguments: 1) whether the warrantless search of a residence was without probable cause; 2) whether the consent to search the residence was obtained unlawfully and without knowing, voluntary and intelligent consent; 3) whether the search of defendant's person at the residence was without probable cause and was not a valid Terry pat down; 4) whether the detention of defendant following the search was an invalid detention; and 5) whether the interrogation of defendant, i.e., the questioning concerning whether defendant had a license to carry a firearm, was a custodial interrogation and a violation of defendant's Miranda rights. Id. at 36-37. Essentially, although five issues were raised, there were two main thrusts of defendant's arguments: whether a gun seized during the search of the residence at issue should be suppressed

and whether the statements made by defendant in response to questioning by a police officer regarding a license to carry a firearm should be suppressed.  Id.

The court heard testimony from Officer Phil Mercurio and Officer Robert Kavals.  After hearing testimony and argument from counsel for both defendant and the government, the court ruled on four of defendant's challenges.  Among other things, the court found that defendant did not have a privacy interest in the residence and, therefore, lacked standing to assert a Fourth Amendment challenge to the search of the residence and the seizure of the gun at issue.  The court also found that the officers conducted a valid Terry stop when they encountered defendant in the residence and patted him down as there existed a reasonable suspicion that criminal activity was afoot.  The only remaining issue relates to whether statements made by defendant in response to the officer's questions regarding a license to carry a firearm should be suppressed.

After the suppression hearing, defendant and the government each submitted proposed findings of fact and conclusions of law regarding whether certain statements made by defendant in response to questioning by a police officer regarding whether defendant had a license to carry a firearm should be suppressed.  Defendant argues that the statements were made during an interrogation of defendant that was a custodial interrogation in violation of Miranda.  The government disagrees and argues that the statements should not be suppressed because: 1) defendant's statements were made during a valid Terry stop; and 2) defendant's statements are subject to the inevitable discovery doctrine and are, therefore, admissible.

On this 31st day of October 2006, the court makes the following findings of fact and conclusions of law with respect to the remaining issue raised in defendant's motion to suppress evidence:

I.   **Findings of Fact**

1.  On July 1, 2005, at approximately 3:20 a.m., City of Pittsburgh Police Detectives Philip Mercurio, Robert Kavals and Robert Pires were patrolling the Homewood section of the City of Pittsburgh. Transcript of suppression hearing dated August 7, 2006 ("Tr.") at 7-9. The subject area is well-known to the officers as a high-crime area. Id. at 8, 41. In addition, the officers have made several arrests in the subject area for offenses involving both drugs and firearms. Id.

2.  As the officers patrolled the area, in an unmarked car, they observed defendant standing in front of 615 Collier Street. Id. at 9. Defendant was approximately 50 to 60 feet away from the officers' vehicle. Id. Detective Mercurio noted that defendant, who was wearing a long white t-shirt, had a black semi-automatic pistol in the waist band of his pants. Id. As the officers turned onto Collier Street, defendant looked at the officers' vehicle, lifted his shirt to expose the handle of the pistol and ran into the front door of 615 Collier Street. Id. Upon entering the residence, defendant slammed the door shut. Id. The officers did not stop at this time, but instead continued driving down Collier Street. Id.

3.  After passing defendant's location, Detective Mercurio, in order to conduct surveillance of defendant, exited the vehicle and stood behind a fence, which was across the street from defendant's location. Id. While Detective Mercurio conducted this surveillance, he noticed that defendant was again standing in front of 615 Collier Street. Id. Defendant still had his t-shirt tucked behind the semi-automatic pistol. Id.

4. Detectives Kavals, Mercurio and K-9 Officer Hartung gathered at the rear of 615 Collier Street. Id. at 11. Officer Pires conducted surveillance of defendant and advised his fellow officers that defendant was still standing outside of 615 Collier Street. Id. Detectives Kaval, Mercurio and K-9 Officer Hartung walked around the corner, identified themselves as police officers and asked to speak with defendant. Id. at 12. Defendant again fled into the residence at 615 Collier Street. Id.

5. After defendant ran into the house, Detective Kavals encountered the owner/resident (the "owner") of 615 Collier Street on the front porch. Id. at 13. After questioning the ownership of the subject property, Detective Kavals asked whether the owner knew the man who had just run into her residence. Id. The owner indicated that she did not know the individual. Id. Detective Kavals then asked the owner if he could enter the residence. Id. The owner gave the officers permission to enter her residence. Id. Further, the owner unlocked and opened the front door and gave the officers permission to search her residence. Id.

6. As Detective Kavals approached the living room area of the residence, he observed defendant walking out of the kitchen. Id. at 42. Detective Kavals, who had his weapon drawn, told defendant to raise his hands and patted down defendant at that time. Id. Defendant did not have a weapon on his person during this pat down search. Id. at 25. Immediately after the pat down and having been previously informed that defendant was seen in possession of a firearm by his fellow officers, Detective Kavals questioned defendant in a conversational tone whether defendant had a license to carry a firearm. Id. at 42, 44, 47. Defendant replied that he did not have a firearm. Id. Detective Kavals

  then repeated his question and defendant responded that he did not have a license to carry a firearm. Id. Additionally, defendant was unable to produce a valid license to carry a firearm. Id. At the time of this questioning, Officer Kavals acknowledged that defendant was not free to leave. Id. at 47-48. Defendant was not given Miranda warnings prior to Officer Kavals asking him whether he had a license to carry a firearm. Id. Following the question concerning whether he had a license to carry a firearm, defendant was taken to the threshold of the front door where Officer Hartung continued to detain defendant. Id. at 42.

7. After the pat down and the questioning about whether defendant had a license to carry a gun, Detective Kavals obtained permission to search the residence from the owner. Id. at 43. Upon obtaining permission to search the residence, Detective Kavals searched the kitchen area and found a black Colt Commander .45 caliber semi-automatic piston in the microwave in the kitchen. Id. at 42-43. The owner indicated that she neither owned nor possessed a firearm. Id. at 43. At this point, defendant was handcuffed and placed under arrest. Id. at 14.

8. As a matter of course, City of Pittsburgh Police officers verify the ownership of a firearm when a person is unable or unwilling to produce a valid license to carry a firearm. Id. at 43. If an officer suspects or knows that an individual is in possession of a firearm, standard police procedure requires the officer to ask if the individual has a license to carry a firearm. Id. at 43-44. Whenever an individual is unable or unwilling to produce a valid license to carry a firearm, City of Pittsburgh Police officers verify the existence and status of a license to carry a firearm through the Pittsburgh City Index. Id. at 44. Even where a

defendant is silent in the face of questioning related to the possession of a firearm, police officers do not permit the defendant to leave until the officers verify the existence and status of a license to carry a firearm.  Id.

## II.   Conclusions of Law

### A.   *Terry* Stop

#### a.   Applicable Legal Framework

1. The Fifth Amendment to the Constitution of the United States of America provides in relevant part:  "No person ...shall be compelled in any criminal case to be a witness against himself...."  U.S. CONST. Amend. V.  A criminal defendant must be given Miranda warnings during a custodial investigation.  Miranda v. Arizona, 384 U.S. 436 (1966).  Miranda warnings are not required, however, during a valid Terry stop.  Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 184 (2004).

#### b.   Questioning During *Terry* Stop

2. It is well settled that an individual can be detained for reasonable periods of time and under reasonable conditions during searches to protect the individual's safety and the safety of the officers.  Torres v. United States, 200 F.3d 179, 185 (3d Cir.1999).  Further, the Supreme Court has held that, in the face of a reasonable suspicion that a person may be involved in criminal activity, a police officer may "stop the person for a brief time and take *additional steps* to investigate further."  Hiibel v. Sixth Judicial Dist. Court, 542 U.S. at 184 (emphasis added).  In Hiibel, the Court reasoned that "[a]sking questions is an essential part of police investigations."  Id.  Additional actions during a Terry stop such as

"drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995).

3. Handcuffing an individual does not necessarily constitute an arrest such that an individual is entitled to receive Miranda warnings. Baker v. Monroe Township, 50 F.3d 1186, 1192 (3d Cir. 1995). Similarly, there is no per se rule that pointing a gun at an individual is tantamount to placing the individual under arrest. Id. Courts have been reluctant to find that such actions constitute a custodial arrest because courts recognize that police officers must take reasonable steps to ensure their own personal safety. Michigan v. Long, 463 U.S. 1032, 1047-48 (1983).

4. In the instant matter, defendant argues that at the time Detective Kavals asked him if he had a license to carry a firearm, defendant was under arrest and was subject to a custodial interrogation. Defendant argues, therefore, that Miranda warnings should have preceded Detective Kavals' questions. While the facts of this case pose a close question, this court disagrees.

5. It is clear that police officers are permitted to obtain information confirming or dispelling their suspicions during a Terry stop. Berkemer v. McCarty, 468 U.S. 420 (1984). The fact that an individual is briefly detained while asked a moderate number of questions does not, by itself, give rise to a custodial investigation. United States v. Swanson, 341 F.3d 524, 528-29 (6th Cir.2003). In Swanson, the United States Court of Appeals for the Sixth Circuit recognized that

> [t]he very nature of a Terry stop means that a detainee is not free to leave during the investigation, yet is not entitled to Miranda rights. Therefore, the pertinent question is whether [the suspect] was "in custody" during the investigatory detention for the purposes of determining whether his Fifth Amendment rights were violated.

Id. at 528 (citing Berkemer, 468 U.S. at 439-41). The court of appeals further reasoned that

> [i]n determining whether a defendant was subject to custodial interrogation we look to the totality of the circumstances "to determine 'how a reasonable man in the suspect's position would have understood the situation.'" The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."

Id. at 528-29 (emphasis added) (internal citations omitted). The court of appeals, noted that when reaching the question with respect to whether a Terry stop has risen to the level of a custodial interrogation, a district court should consider (1) the purpose of the question; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or acquiesced to their requests to answer some questions Id. at 529 (cited in United States v. Thomas, 142 Fed. Appx. 896 (6th Cir. 2005), which found that where police asked a suspect, who was sitting in the police car and had been seen throwing an object believed to be a gun, whether he had a license to carry a firearm, the question was "benign and unintrusive" and did not cause the Terry stop to rise to the level of a custodial interrogation).

8

6. Here, the police officers witnessed defendant with a gun in his possession. Immediately after a pat down which this court found was part of a valid Terry stop, the officer asked defendant in a conversational tone whether he had a license to carry a firearm. The questioning of defendant was extremely brief in that it involved merely the question regarding whether defendant had a license to carry a gun. This question is benign and unintrusive. Further, at the time of the question, defendant was not handcuffed and was not in a police car. Defendant was in the residence at 615 Collier Street. Although defendant was not free to leave at the time of the subject Terry stop, this inability to move does not change the proper Terry stop into a custodial interrogation and does not implicate defendant's Miranda rights given the briefness of the pat down and the immediacy of the questioning following the pat down. Id.

7. Defendant argues that because the officers pointed a gun at him at some time during the Terry stop, the stop rose to the level of a custodial interrogation. This contention is without merit. Pointing the gun was a "reasonable step necessary to ensure [the officers'] personal safely" in that the officer witnessed defendant with a semi-automatic weapon. Long, 463 U.S. at 1047-48. Additionally, the United States Court of Appeals for the Third Circuit has made clear that pointing a gun at an individual does not per se cause a Terry stop to rise to the level of placing one under arrest thereby implicating a suspect's Miranda rights. Baker v. Monroe Township, 50 F.3d at 1192. For these reasons, after considering the totality of the circumstances, the court finds that the brief questioning, immediately following the pat down, regarding the license to carry a permit occurred during a proper Terry stop of defendant, and is, therefore, permissible.

      **b.**    **Inevitable Discovery Doctrine**

8. Even assuming, *arguendo*, that defendant was entitled to receive Miranda warnings prior to being questioned regarding a license to carry a firearm, a response to this question would not be suppressed pursuant to the inevitable discovery doctrine.

9. In Nix v. Williams, 467 U.S. 431 (1984), the Supreme Court carved out an exception to the exclusionary rule. There the Court held that where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means…the deterrence rationale has so little basis that the evidence should be received." Id. at 444. It is well settled that the prosecution has the burden of proving that the subject evidence would have been inevitably discovered. Id.; United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998). In Nix, the Court applied the inevitable discovery doctrine to the subject physical evidence and permitted the admission of the physical evidence. Nix at 449.

10. The inevitable discovery doctrine has been applied to testimonial evidence. See, e.g. Wong Sun v. United States, 371 U.S. 471, 486 (1963) (reasoning that "the policies underlying the exclusionary rule [do not] invite any logical distinction between physical and verbal evidence"); United States v. Martinez-Gallegos, 807 F.2d 868, 870 (9th Cir. 1987) (finding that where the substance of a statement would have been inevitably discovered, the statement is admissible); *cf.* Vasquez De Reyes, 149 F.3d at 195 (noting that "we know of no articulation of the inevitable discovery doctrine that restricts its application to physical evidence").

11. In Martinez-Gallegos, the defendant had been stopped in connection with a routine traffic stop. During the traffic stop, the defendant failed to produce proof of insurance, registration or identification. As a result of his failure to produce any of the required documentation, the defendant was incarcerated. Police officers questioned whether the defendant was a United States citizen and the defendant responded that he was not. Police officers, therefore, contacted Immigration and Naturalization Services ("INS") agents who questioned defendant regarding his name and other background information. When the INS agents reviewed the defendant's "A" file, the agents learned that the defendant had been deported twice in the past. Each of these questions occurred without giving the defendant Miranda warnings. Id. The defendant sought to suppress the evidence claiming that his statements were obtained in violation of his Fifth Amendment right against self-incrimination. In affirming a finding for the prosecution, the court of appeals reasoned that even if the defendant had refused to answer the agents' questions, the only recourse available to the agents was to consult the "A" file. The evidence, therefore, would have been inevitably discovered. Id. at 870.

12. Defendant relies on Vasques De Reyes to support his contention that the testimonial evidence in the instant matter should be excluded. Defendant's reliance on Vasquez De Reyes, however, is misplaced. Vasquez De Reyes is clearly distinguishable from the case *sub judice*.

13. In Vasquez De Reyes, the defendant was illegally detained by INS agents in connection with an investigation involving fraudulent permanent residency cards. During the period of time the defendant was detained for questioning, INS agents questioned the defendant

regarding her citizenship. The defendant admitted that she was a citizen of the Dominican Republic, but claimed that she was legally present in the Virgin Islands. The defendant was able to produce documents showing that she was married to a citizen of the Virgin Islands, but was unable to produce any documents showing that she was legally present in the Virgin Islands. The defendant, therefore, was incarcerated.

14. Following the defendant's incarceration, the defendant's husband was questioned regarding his marriage to defendant. Although defendant's husband answered these questions, an INS agent visited his home, questioned his mother and ultimately learned that the defendant did not live with her husband. In the face of this information, the defendant confessed to committing marriage fraud. After entering a conditional plea, the defendant moved to suppress the statements.

15. The prosecution argued that the fraudulent nature of the defendant's marriage would have been inevitably discovered. Thus, statements made by the defendant's husband and his mother should be admissible. The court of appeals in <u>Vasquez De Reyes</u> considered testimony of an INS adjudicator regarding the procedure for investigating the validity of marriages between United States residents and aliens. The adjudicator testified that the INS procedure is initiated when the United States resident submits an I-130 form on behalf of the alien spouse. After the I-130 form is submitted, the couple must either submit an I-485 form or complete a State Department form at the United States Embassy of the spouse's home country. There is no specific time frame within which an individual must submit the I-485 form. Indeed, it is not required that an individual ever submit the I-485 form. *If,* however, the couple submits an I-485 form and both spouses are on

American soil, the INS *ordinarily* conducts an interview of the spouses. If the spouses' answers differ greatly during the interview, the INS adjudicator *may* request an investigator to visit the couple's home in order to analyze the legitimacy of the couple's marriage.

16. In finding for the defendant, the court in <u>Vasquez De Reyes</u> noted that "[p]roof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." <u>Id.</u> at 195. The speculative nature of the INS procedure precluded the district court from applying the inevitable discovery doctrine. The court of appeals noted that the conditions necessary to determine the legitimacy of the couple's marriage involved a number of factors.

17. In order to find that the statements made by the subject parties were inevitable, the court of appeals in <u>Vasquez De Reyes</u> would have had to find that the defendant would not have returned to the Dominican Republic to submit the State Department form in her own country and that under routine INS procedures the defendant and her husband would have been interviewed following her application. There, however, was no assurance that (1) the defendant would file an I-485 form instead of a State Department form in her own country; (2) an INS agent would have inevitably become suspicious during an interview and request a home visit; and (3) the interview and the home visit would have inevitably indicated that the marriage was a sham, thus causing the couple to confess to committing marriage fraud. There was nothing about the entire process that was guaranteed or required. The inevitable discovery doctrine, therefore, was not applicable in that case.

18. In reaching its decision, the court of appeals in <u>Vasquez De Reyes</u> noted that it knew of "no articulation of the inevitable discovery doctrine that restricted its application to physical evidence." <u>Id.</u>

19. The instant matter, however, is notably different than <u>Vasquez De Reyes</u>.  Here, Detective Kavals testified that  where an individual is witnessed with a firearm, the police procedure relating to the ensuing investigation is neither speculative or tentative.  Detective Kavals testified that standard police procedure requires a police officer to verify the existence and status of a license to carry a firearm when an individual is believed to or suspected of having a gun.  In the instant matter, there is a guarantee with respect to what procedure is followed when an officer sees an individual in possession of a weapon.  Regardless of what answer defendant gave to the question regarding a license to carry a weapon, the police officer would have checked the status of defendant's license to carry a firearm through the Pittsburgh City Index.  Upon checking the status through the Pittsburgh City Index, the officer would have inevitably learned that defendant did not possess a license to carry a firearm.  This is the exactly what occurred in the instant matter.

20. When defendant indicated that he did not have a license to carry a firearm, Detective Kavlas, nonetheless, in accordance with standard police procedure, verified the status of the subject license.  The detective learned that defendant did not have a license to carry a firearm and was, in fact, prohibited from possessing a firearm.  This is precisely the type of testimonial evidence anticipated by the inevitable discovery doctrine; evidence that is "capable of ready verification, and not speculation." <u>Nix</u> 467 U.S. at 444.  The case *sub*

*judice*, like <u>Martinez-Gallegos</u>, involves testimonial evidence that would have been inevitably discovered regardless of any statement made by defendant.

21. Accordingly, even had the police officer violated defendant's Fifth Amendment rights when questioning him regarding a license to carry a firearm, the answer to this question was readily ascertainable, and, thus, subject to the inevitable discovery doctrine. The court concludes that even if <u>Miranda</u> warnings should have been given, the prosecution proved by a preponderance of the evidence that the statements in issue are admissible because "the information ultimately or inevitably would have been discovered by lawful means...." <u>Nix</u>, 467 U.S. at 444.

### III. Conclusion

For the foregoing reasons, defendant's motion to suppress the statements made by defendant in response to questions concerning whether he had a license to carry a firearm is denied.

By the court:

 /s/Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: October 31, 2006

cc:   Counsel of Record